# CHARLESTON.

## Jameson v. Myles' Exor.

### February 27, 1874.

1874.
January Term.

M., deceased, in his lifetime and at his death, was the owner of personal and real property, in Greenbrier county, in this State; and at his death he was indebted in an amount so large that it was doubtful whether his real and personal estate were, together, sufficient to pay his debts. Sometime prior to his death he made and published his will, in due form; which was, after his death, in the year 1867, duly proven by the subscribing witnesses and admitted to record in said county. The first, second, third and fifth clauses of the will are in these words, viz:

"*First.* I direct that Richard H. Gillilan be my executor until my oldest son, Aquilla Myles, becomes twenty-one years of age then I direct that he be associated with said Gillilan, and that they jointly act in the management of my affairs.

*Second.* I direct that my business be carried on in the same manner that it would be, provided I were living, by my executors, for the term of eight years after my decease; that my sons all remain and work together until that time, in order that they may may pay all the debts against my estate, with the understanding that each receive, in the division to be hereafter named, a fair compensation for their labor, from the time they are twenty-one years of age up to the expiration of the eight years above named. My daughter Emily Myles, to remain in the family, as one of the same, until the expiration of the time above mentioned, provided she does not marry, but to receive no compensation for her services other than her sustenance.

*Third.* I empower my executor or executors, to collect all money due me and apply to the payment of my just debts; and should my creditors be not willing to wait until the money can be made and collected, I direct my executor or executors, to give a lien on my lands, or so much thereof as may be necessa-

ry, in order to prevent suit being brought on my debts and costs added thereto. If my creditors will not wait, I direct that so much of my lands be sold as may be required to satisfy the same.

*Fifth.* At the expiration of the eight years above named, I direct that my property, of all kinds, be divided equally among my daughter and all my sons, taking into consideration the wages due those who have arrived at twenty-one years of age previous to this time, as above provided for; hereby revoking all other wills and decrees by me made."

Gillilan qualified as executor, at the time the will was admitted to probate. Afterwards, in the year 1868, and before G. had made any settlement of his executorial account, J. filed his bill in the circuit court of Greenbrier county, claiming that he was the owner, by assignment, of two bonds executed by M., the 5th day of December, 1859, to C., and payable on demand, for $500 and $492, respectively, which were still due and unpaid; but he does not make an exhibit of the assignment or prove it, or expressly allege who assigned the bonds to him; and alleging that it was doubtful if the real and personal estate of M. were together sufficient to pay his debts: And praying that the executorial account of G. be settled, and that the creditors of M. be convened before a commissioner of the court and that their debts be ascertained and reported. The executor and children of M. were the only party defendants to the bill, some of whom were infants· Afterwards, the cause was, by decree regularly made, referred to commissioners, for the purposes prayed in the bill. While the cause was before the commissioner, K. appeared before him and claimed that the estate of M. was indebted to him in the sum of $6,000, and that the same constituted a lien, for its payment, first in priority, upon a certain tract of the land of decedent, and the commissioner, from the evidence before him, reports these facts in relation to said claim, viz: "Some of the creditors of Myles insisting on the payment of their debts, and the executor having no funds to meet the demands, he did, on the 29th day of March, 1862, borrow of K. $4,140, of which about $600 was in bank notes and the remainder in Confederate money. He also took up a bond executed by Joseph Myles to K. on the 15th of March, 1861, for $1,750.90, which, with the interest thereon and the money borrowed, amounted, on the 29th of March, 1862, to the sum of $6,000, for which said G. executed to K. his bond as executor of M. G., executor, to secure the payment of his bond, executed a trust deed upon a tract of land belonging to the estate, situated on Anthony's creek, he understanding himself to be authorized so to do by the will." "The Confederate money was worth at the time of the loan seventy-seven cents in gold per dollar." It is proved that the executor applied the whole of

the money borrowed of K. to the payment and extinguishment of certain of the debts of M., and that the debts of M. were thereby extinguished to the amount of money so borrowed.—HELD:

1. That, under the circumstances, it is proper and just that K. should be allowed, as against the estate of M., his original debt of $1,750.90, $600 for the bank notes, with their interest, and at least the gold value of the Confederate money at the time it was loaned.

2. That K. did not acquire, by virtue of the deed of trust, the right to have his said debt against the estate of M. satisfied out of the proceeds of the sale of the tract of land in the said deed mentioned, in preference to the other creditors of M.

3. It is error to confirm the report of the commissioner of the court allowing J. the debt claimed by M. in his bill, and direct the same to be paid by G., the executor, to J., without C., the obligee in the two bonds, being first made a party to the cause.*

Appeal, by Alexander Kearns, from a decree of the circuit court of Greenbrier county, made and entered on the 29th day of June, 1870, in a certain suit in chancery therein pending, wherein David Jameson was complainant and R. H. Gillilan, executor of Joseph Myles, deceased, Emily Myles, Erasmus Myles, Turpin Myles, Joseph Myles, and the following infant heirs at law of said Joseph Myles, deceased, were respondents, to-wit: Harlow Myles, Augustus Myles and Edward Myles. The said Kearns was creditor of the estate of the said

---

*The following is the act referred to in the opinion of the Court:

"1. That in any action or suit or other proceeding for the enforcement of any contract, express or implied, where such contract was for the sale or purchase of any real or personal property, made or entered into between the first day of May, 1861, and the first day of May, 1865, it shall be lawful for either party to show by parol or relevant testimony, what was the true understanding and agreement of the parties thereto, either express or to be implied, in respect to the kind of currency in which the same was to be fulfilled or performed, or with reference to which, as a standard of value, it was made or entered into; and in an action at law or suit in equity it shall be necessary to plead the agreement specially, in order to admit such evidence.

"2. Whenever it shall appear that any such contract was according to the true understanding and agreement of the parties, to be fulfilled

40

Myles, and, as such, his claim was proved and allowed, in part, by the commissioner appointed to take an account below. From said decree, which established the priorities of the creditors of the said Myles, deceased, which the said Kearns, for error on that account, and for other errors, alleged, was erroneous, he took this appeal. The facts in the case sufficiently appear in the opinion of the Court.

The Hon. Joseph M. McWhorter, judge of said circuit court, presided at the hearing below.

*Samuel Price* for the appellant Kearns.

*Mathews & Mathews* for Myles' executor.

HAYMOND, PRESIDENT:

The plaintiff filed his bill on the first day of March, 1868, in the circuit court of the county of Greenbrier, against the executor and children of Joseph Myles, deceased, in which it is alleged, that plaintiff is the owner of two bonds executed by Myles to Joseph H. Correll for the purchase money of a tract of land, both dated December 5, 1859, payable on demand, one for $500, the other for $492, and assigned to him ; that Myles, before

or performed in Confederate States treasury notes, or Virginia treasury notes, or was entered into with reference to such notes as a standard of value, the same shall be liquidated and settled by reducing the nominal amount due or payable under such contract in Confederate States treasury notes or Virginia treasury notes, to its true value at the time they were respectively made and entered into, or at such other time as may to the court, or, if it be a jury case, to the jury, seem right in the particular case, and upon the payment of the value as ascertained, the party bound by such contract shall be forever discharged of and from the same, provided that in all cases where actual payment has been made of any sum of such Confederate States treasury notes, or Virginia treasury notes, either in full or in part, of the amount payable under contract, the party by whom or for whom the same was paid, shall have full credit for the nominal amount as paid, and such payment shall not be reduced. And if any debt payable in coin, or its equivalent, by a principal debtor has been paid by the security for such debt, under and by virtue of a judgment against such security, or other demand for payment upon such security, so that such payment shall operate as a discharge of the principal debtor from his original obligation under the provisions of this act, in any controversy between such security so paying and the principal debtor, the mode of payment by such security shall not be inquired into."

his death, made and published his last will and testament, which, after his death, was duly proven and admitted to probate in the county of Greenbrier; that by the will Richard H. Gillilan was appointed executor thereof, and that he qualified and is acting as such; that Myles was seized of considerable real and personal estate; but his personal property is insufficient to pay his debts and it is doubtful whether the whole of his estate, real and personal, will be sufficient to pay his debts; that there are many debts unpaid, and the executor has not settled his executorial account; that part of the children of Myles are infants, &c. The bill prays that the executor be required to settle his executorial account before a commissioner of the court, and that the commissioner be required to report all the debts against the estate of the decedent—that the real estate of the decedent, so far as necessary, be appropriated to the payment of his debts, &c. An official copy of the will of decedent is filed in the cause. The infant defendants answered by guardian *ad litem.* The answer is formal, and prays that the court protect the interests of the infants. The adult defendants failed to answer the bill, and, on the 6th day of August, 1868, the cause was regularly heard upon the bill taken *pro confesso,* as to the adult defendants, exhibits and upon the answer of the infant defendants by their guardian *ad litem.* And the court decreed that the executor render his account as such before D. C. B. Caldwell, one of the commissioners of the court, and that the commissioner, take, state, and report an account of the indebtedness of the decedent and that to enable him to do so, before taking the account, he convene the creditors, by publication, &c. Another order was made in the cause on the 20th of June, 1870, not material to be further noticed here, so far as we can see from the record presented. Commissioner Caldwell made and filed his report and from the part of which is copied into the record it appears that "some of the creditors of Myles insisting on the payment of their debts, and

the executor having no funds to meet the demands, he did, on the 29th day of March, 1862, borrow of Alexander Kearns $4,140, of which sum about $600 was in bank notes and the remainder in Confederate money. He also took up a bond, executed by Joseph Myles to said Kearns, on the 15th day of March, 1861, for $1,750.90, which, with interest thereon, and the money borrowed, amounted, on the 29th of March, 1862, to the sum of $6,000.00, for which Gillilan executed to Kearns his bond, as executor of Myles. Gillilan, to secure the payment of this bond, executed a trust deed upon a tract of land belonging to the estate on Anthony's creek, he understanding himself to be authorized so to do, by the will." The appellant appeared before the commissioner and presented his claim for $6,000 with interest and proved the above facts. He not only claimed the full amount of the $6,000.00, with interest, but he also claimed and now claims, that the $6,000.00 with its proper interest, by reason of the deed of trust made by the executor, constitutes a valid lien first in priority, upon the tract of land in the deed of trust mentioned. It was proven before the commissioner that the executor applied all the money, so borrowed by him from appellant, to the payment of certain just debts, existing against the estate of Myles. Under this state of facts the commissioner rejected the $6,000.00 bond claimed by Kearns and allowed to him in his report only the $1,750.90 of his claim, with interest thereon to the 29th of June, 1870, amounting to $976.38. The appellant (Kearns) filed exceptions to the commissioner's report, by which he insists that the commissioner erred in rejecting his claim for $6,000.00, and that the commissioner erred in allowing him only $1,750.90, of his claim. On the 29th day of June, 1870, the cause was further heard, by the court, upon the papers formerly read and report of commissioner Caldwell with the exceptions of defendants R. H. Gillilan and of Alexander Kearns thereto, and depositions accompanying the report. And the

court in and by its decree, sustained part of the exced-

tions of appellant (Kearns) and allowed him of his
claim $1,750.90, original debt, and the interest thereon
to the 29th of June, 1870, $976.38 ; and $600.00 bank
notes and interest thereon to same date $297,00, making
an aggregate sum of $3,624.28 with interest from the
29th day of June, ascertained and deemed by the court
to be justly due to Kearns. The other exceptions were
overruled by the court, and the report of the commis-
sioner confirmed, except as above stated. The court, by
this decree, directed the defendant Gillilan to proceed to
pay said debts in the order they are reported, first paying
the costs of the suit, the preferred debts to be paid rata-
bly, and the *non* preferred debts the same. The same
decree further directs, because of its appearing from the
report that the assets in hand will not be sufficient to
pay the debts, that Gillilan (the executor) sell so much
of the remaining real estate, on a credit (except
sufficient to pay costs of sale, which is to be paid down)
as will pay the debts reported, including the plaintiffs
debt, &c. From this decree an appeal has been allowed
Kearns to this Court. And the appellant, assigns the
following grounds of error in the decree :

"*First.* Because the court did not allow the whole
bond of $6,000. It was all used in paying debts.

"*Second.* Because the court did not sustain the deed of
trust and give him preference over all other creditors,
so far as the trust property was concerned.

*Third.* Because the court did not, at least, allow the
gold value of the Confederate money, and other errors
upon the face of the record."

For convenience, the *first* and *third* special assigments
of error will be first considered, and together.

From the report of the commissioner, and the evidence,
it is manifest that it was right and just to allow the ap-
pellant (Kearns) the items before stated amounting in
the aggregate to $3,624.28. The whole amount of the

claim of the appellant was allowed by the court, except $3,540, the face amount of the Confederate money loaned by the appellant to the executor, and for this the court refused to allow any amount. The report of the commissioner shows that the gold value of the Confederate money at the time the executor received it was seventy-seven cents per dollar, and the evidence establishes that the executor applied the Confederate money to the payment of certain of the creditors of the decedent to the full amount thereof, and that debts against the decedent's estate to that extent were extinguished. Thus it is seen that the estate of the decedent, and creditors of the estate have been benefitted by, and to, the amount of the Confederate money, certainly to the amount of its gold value. The gold value of the Confederate money was, at the day it was received, according to the report of the commissioner, $2,726, and the interest on the same to the 29th of June, 1870, is $1,376.63, making an aggregate sum of $4,102.63, which should, at the least, have been allowed the appellant, by the commissioner and circuit court, to bear interest from the 29th day of June, 1870, in addition to the sum of $3,624.48, with interest, which was allowed by the circuit court. That the appellant should, under the circumstances of this case, be allowed at least the gold value of the Confederate money, is clearly just and equitable, and in accordance with the principles established in the case of *Thorington v. Smith*, 8 Wall, (Sup. Ct. U. S.) and also the act of the Legislature of this State, passed at the adjourned session held in 1873. The first error assigned by appellant under this view is overruled, but the third error assigned is sustained.

The *first* clause of the will of Myles appoints Gillilan executor. The *second* and *third* clauses are as follows, viz.:

"*Second.* I direct that my business be carried on in the same manner that it would be provided I were living, by my executors, for the term of eight years after my de-

cease ; that my sons all remain and work together until that time, in order that they may pay all the debts against the estate, with the understanding that each re- ceive, in the division to be hereafter named, a fair com- sation for their labor from the time they are twenty-one years of age up to the expiration of the eight years above named ; my daughter Emily Myles to remain in the fam- ily as one of the same until the expiration of the time above mentioned, provided she does not marry, but to receive no compensation for her services other than her sustenance.

"*Third.* I empower my executor or executors to collect all money due me, and apply it to the payment of my just debts, and should my creditors be not willing to wait until the money can be made and collected, I direct that my executor or executors give a lien on my lands, or so much thereof as may be necessary in order to pre- vent suit being brought on my debts, and costs added thereto. If my creditors will not wait, I direct that so much of my lands be sold as may be required to satisfy the same."

The will is dated the 11th day March, 1861, and was admitted to probate April 9th, 1867. The twenty-fifth section of the one hundred and thirtieth chapter of the code of Virginia of 1860, which was in force in Virginia at the date of the will, and has continued to be law in this State since its formation, provides how the assets of a decedent, in the hands of his personal representative, after the payment of funeral expenses and charges of ad- ministration, "shall be applied," where such assets are not sufficient for the satisfaction of all demands against him.

*First.* To debts due to the United States.

*Second.* Taxes and levies assessed upon the decedent previous to his death.

*Third.* Debts due as personal representative, guardian or committee where the qualification was in this State in

which debts shall be included a debt for money received by a husband acting as such fiduciary in right of his wife.

*Fourth.* All other demands ratably, *except* those in the next class. And

*Fifth.* Voluntary obligations.

The third section of the one hundred and thirty-first chapter of the Code of Virginia of 1860, and the Code of West Virginia of 1868, provide that "all real estate of any person who may hereafter die, as to which he may die intestate, or which, though he die testate, shall not by his will be charged with or devised subject to the payment of his debts, or which may remain after satisfying the debts with which it may be so charged, or subject to which it may be so devised, shall be assets for the payment of the decedent's debts, and all lawful demands against his estate, in the order in which the personal estate of a decedent is directed to be applied." If a testator could, by will, authorize his executor to make a preference among his creditors in the application of the assets other than that directed by law, (which is not here determined) it is manifest by the second and third clauses of the will of Myles, that he did not mean or attempt to give such authority to his executor. It is clear by the second clause of the will that it was not his wish that his lands should be sold or incumbered with liens by his executor, but that his debts should otherwise be paid. Especially is this so, when that clause is read in connection with the third and fifth clauses. The fifth clause directs that "at the expiration of the eight years, above named, my property of all kinds be divided equally among my daughter and all my sons," &c. His wish was that his lands should be held and enjoyed by his children, and his debts be paid within the eight years, otherwise than by resorting to the lands; but if his creditors should not be willing to wait until the money could be made and collected, as

he wished, then, in that event, he directs his executor to give a lien on his lands, or so much thereof as should be necessary, on time, for the equal benefit of all his creditors to prevent suits being brought and to save costs, and not for the benefit of a part of his creditors only. But if his creditors would not give time or wait, if the lien was given, then in that event he directed that so much of his lands be sold as should be required to pay all his debts. This was clearly the meaning and purpose of the testator in this case. Powers were conferred, or attempted to be conferred, upon the executor, touching the lands, to be exercised only upon the happening of certain contingencies named. Under the circumstances the deed of trust made by the executor for the benefit of the appellant on the parcel of land therein mentioned should not be construed to constitute a lien or give priority to plaintiff, for his debt over and above the creditors of the fourth class, mentioned in the law, to which reference has been made, but he should be paid equally with creditors of that class. The appellant's *second* assignment of error is therefore overruled.

It does not appear that Joseph H. Correll, the person to whom the two bonds against Myles, in the plaintiff's bill mentioned, was made, or is, a party to this suit. The plaintiff claims these two bonds by assignment. But he does not refer to the bonds as exhibits filed with his bill, nor does he allege expressly that Correll assigned them to him; and he does not set out the assignment or even aver that it was for value. He describes the bonds by stating their dates, amounts and when payable, and simply says they were assigned to him, and that he is the owner of them. The bonds do not even appear in the record; nor is there any assignment of the bonds appearing in the record or proof thereof. Before a special court of appeals in Virginia consisting of Brooke and Cabell, judges of the court of appeals, and Scott, judge of the general court, it was *held* that, "In

41

every case of a bill in equity, asking relief for the plaintiff, as assignee of the rights of another, the assignor must be made a party, &c. *Corbin v. Emerson*, 10 Leigh, 663. In the cases of the *James River and Kanawha Company v. Littlejohn* and *Littlejohn v. Ferguson*, 18 Gratt. 53, it was held by the court of appeals of Virginia that "to a bill filed by an assignee of a chose in action, if the assignment purports to transfer the whole interest of the assignor, and there is nothing in the pleadings and proofs to induce the belief that it did not really do so, the assignor is not a necessary party. In the last named case the assignor was made a party defendant in the writ, but not in the bill, and there was an order of publication executed as to him. The bill of the assignee alleged that on the 8th day of February, 1859, J. C. Robinett (the assignor) was indebted to him, in the sum of $783.45, and on that day executed to the plaintiff his note for the amount, payable on demand; and at the same time drew an order on the James River and Kanawha Company, who were indebted to him, as a contractor on their canal, for the amount of the note, with interest from its date; which note and order were made exhibits with the bill. The order was the assignment. The defendants were all adults. The case under consideration is widely different from that last cited. In this case there are interested infant defendants—the assignment is not set out or exhibited or proved. It may not in all cases whatsoever be true that an assignor is an indispensible party. Still it is evident from the authorities that there are many cases where it is essential. This is evident, according to the opinion of the court delivered by judge Joynes and the cases therein cited, in the case in 18 Grattan, before referred to. From what has gone before it is apparent that it was error in the circuit court to confirm the report of the commissioner, and direct the debt claimed by the plaintiff, in his bill, or any part thereof, to be paid by him, without the obligee first being made a party.

For these reasons the decree of the circuit court of Greenbrier county, rendered on the 29th day of June, 1870, must be reversed and the appellant recover his costs about the prosecution of his appeal here expended. And this Court proceeding to render such decree as the court below ought to have rendered, it is adjudged, ordered and decreed that this cause be remanded, to the circuit court of Greenbrier county for further proceedings therein to be had, according to the principles announced in this opinion and the rules governing courts of equity in such cases, with leave to the plaintiff to file an amended bill making Joseph H. Correll a party to this suit and such other persons as may be proper.

The other Judges concurred.

DECREE REVERSED AND SUIT REMANDED WITH LEAVE TO AMEND.